COLT & COLT
v.
M'MECHEN.

Common carriers are liable for every injury which happens to goods entrusted to their care, unless it is caused by the act of God, or of the enemies of the land.

Where a vessel was beating up the *Hudson* against a light and variable wind, and being near shore, and while changing her tack, the wind suddenly failed, in consequence of which she ran aground and sunk; it was held, that the sudden failure of the wind was the *act of God*, and excused the master; there being no negligence on his part. Whether there be negligence or not, is a question of fact, for the jury to decide.

## COLT and COLT *against* M'MECHEN.

THIS was an action on the case, against the defendant, as a common carrier of goods for hire, in a certain sloop, called the *Margaret*, between *Kinderhook* and *New-York*, on the *Hudson* river. The declaration stated that the plaintiffs were possessed of certain goods, &c. which the defendant, by his servant, *Matthew M'Kean*, master of the said sloop, received on board to carry, transport, and convey, from *New-York* to *Kinderhook* landing, for a reasonable price or compensation, &c. but that the goods were never delivered, &c. *Plea*, not guilty.

The cause was tried at the *Columbia* circuit, in *October*, 1808, before Mr. Justice *Spencer*.

Several witnesses testified, that the sloop was overladen when she left *New-York*, having fifteen or twenty tons more than her tonnage, which was about 75 tons. Other witnesses said it was usual to load vessels, which sailed on the river, much beyond their tonnage, and it was not regarded as unsafe.

*M'Kean*, the master, testified that the sloop was loaded *wale to*, but not overloaded; that she had not more than 80 or 85 tons, &c. on board; she had carried 95 tons with safety. That the wind was adverse, but they met with no difficulty, until they got to the *high lands*, when the vessel ran aground; but that other vessels, more lightly loaded, at the same time also got aground. That the *Margaret*, after being lightened, got off, and having reloaded the goods taken out, proceeded to beat up the river, against a head wind; that from the lateness of the season, and for fear of ice, he was anxious to reach *Livingston's* dock, which was a place of safety, and to which he had nearly arrived, when the accident happened. The wind was light and variable, but sufficient, if it had continued, to enable him to reach the dock. While standing

on a tack to the west shore, and when they had approached it, as near as was usual and proper, the helm was put down to bring the vessel about; the jib began to fill, and the vessel had partly changed her tack, when the wind suddenly ceased blowing, and the headway under which the vessel then was carried her on the bank; that while standing to the west shore, there was wind enough to enable him to manage the vessel with safety, and had it continued, the witness was confident the sloop would have come about and proceeded safely; but that the sudden failing of the wind was the cause of her running aground; that they immediately got out the anchor, and tried to get her off, but could not succeed, as she went aground at high water; they removed as much of the cargo forward as they could, and as the tide fell, the stem of the vessel settled; they made every exertion to get her off, from 4 A. M. when she struck, until about 10 A. M. when she sunk. The witness had been several years engaged in navigating the river, and was well acquainted with the navigating of sloops up and down. The vessel was staunch and in good order, and had two men and two boys, who were a competent crew. The vessel had no dead lights; it was expected that she would rise with the flood tide, but she did not; and the water rushed into the cabin windows, and she was filled and logged, but they had no apprehensions of her sinking. The defendant owned a great part of the cargo; and every exertion was made to obtain a lighter, but they could not procure one, until the next morning. The master's evidence was confirmed by the crew.

The plaintiff proved that there were three ferries within a mile of the place where the vessel went aground, and that ferry-boats might have been easily obtained to assist in lightening the vessel, but no application was made for that purpose. It appeared that a sloop was procured from *Catskill*, to assist the vessel, after she had sunk. The vessel was regarded, by the people on shore,

as in a dangerous situation from the time she first struck, and there was some contrariety of evidence as to the conduct of the master, in regard to the vessel, after she went aground.

The damage which the goods of the plaintiff received, was from 10 to 20 *per cent.* besides some which were wholly lost, amounting to 1,316 dollars.

The judge told the jury, that the common law rule, as to common carriers, applied with full force to the present case. There were only two exceptions to their liability in case of loss; namely, where the loss was occasioned by the act of God, or the enemies of the land; that if the jury were satisfied that the vessel went ashore, in consequence of the *sudden failure of the wind,* the law would consider it as the act of God, and excuse the defendant, if there was no subsequent neglect or carelessness in the preservation of the cargo; that if the master and crew, by their diligence, could have saved the vessel and cargo, and neglected to do so, the defendant was responsible for the loss. That if the jury were satisfied that the vessel struck in consequence of the sudden failure of the wind, and that the master and hands had used due diligence after the accident, the defendant was entitled to a verdict; but that if the jury were not satisfied on these points, they ought to find a verdict for the plaintiffs, for the amount of the damages which had been proved. The jury found a verdict for the defendant.

A motion was made to set aside the verdict, and for a new trial, for the misdirection of the judge, and as against evidence.

*E. Williams,* for the plaintiffs, contended, that the sudden failing of the wind was not the act of God, in the legal sense of the term. The vessel was overloaded; the wind was light and variable; the vessel was beating, and while she was standing towards the western shore, the wind died away. Such a failure of wind was an or-

dinary occurrence; it happened every day. It was not
one of those extraordinary events against which no hu-
man diligence and foresight could guard. In the case of
Forward v. Pittard,* Lord Mansfield, considered a com-
mon carrier as an *insurer*, and answerable for every ac-
cident, except such as were occasioned by the act of God,
or the king's enemies.

Again, there was great negligence in the master, after
the accident happened. From 4 A. M. to 10 A. M. there
was sufficient time to have procured lighters and assist-
ance, so as to have saved the goods from damage, before
the vessel sunk. The master did not use due diligence;
he made no application at the ferries, where boats might
have been immediately obtained.

*Van Buren* and *Hoffman*, contra, contended, that the
common law doctrine, with respect to common carriers,
was now considered in *England* as a very hard one, and
against which courts were disposed to lean, in favour of
defendants.† The weight of evidence in this case was
against the assertion that the vessel was overloaded. If
a storm or tempest, if a sudden gust of wind, is to be
considered as the act of God; the sudden failure of the
wind must also, for the same reason, be the act of God.(a)
In *Forward* v. *Pittard*, Lord *Mansfield* considered the
term, " act of God," as meaning something in opposi-
tion to the act of man. " It is such an act as cannot
happen by the intervention of man; as storms, light-
ning, and tempests." In the case of *Amies* v. *Stevens*,‡
where a hoy, in going through a bridge was, by a sud-
den *gust* of wind, sunk, and the goods spoiled, *Pratt*,
Ch. J. held, that " the defendant was not answerable,

*Margin notes:*

ALBANY,
August, 1810.

COLT & COLT
v.
MᶜMECHEN.

* 1 Term Rep.
33. See also, 4
Term Rep. 681.
4 Term Rep. 389.
Abbott, (3 ed.)
258.

† Edwards v.
Sherratt, 1 East,
604.

‡ 1 Str. 127

(a) Sir *William Jones* (*Essay on the Law of Bailments*) thinks it would
be more decent, as well as more proper, to substitute the expression, *inevita-
ble accident*, in the place of *act of God*.

ALBANY,
August, 1810.

COLT & COLT
v.
M'MECHEN.

the damage being occasioned by the act of God; for though the defendant ought not to have ventured to shoot the bridge, if the general bent of the weather had been tempestuous, yet it being only a sudden gust of wind, it entirely altered the case." Whether any negligence was imputable to the master, was a question of fact, and the jury, by their verdict, have negatived the charge of a want of care and diligence.

SPENCER, J.   The plaintiffs have moved for a new trial on two grounds; 1st. For a misdirection to the jury, in stating that the failure of the wind was the act of God; and, 2d. For that the verdict was against evidence, on the point submitted to the jury, in relation to the negligence or carelessness of the master of the sloop, after she struck.

There can be no contrariety of opinion, on the law which renders common carriers liable. However rigid the rule may be, they are responsible for every injury done to goods entrusted to them to carry, unless it proceeds from the act of God, or the enemies of the land. What shall be considered the act of God, as contradistinguished from an act resulting from human means, affords the only difficulty in the case.

The cause was summed up to the jury on this point, " that if they were satisfied from the whole evidence, that the vessel ran ashore in consequence of the sudden failure of the wind, the law would consider it as the act of God, and exculpate the defendant." By finding a verdict for the defendant, the jury have believed the testimony of Captain *M'Kean*, and the other witnesses produced by the defendant, in their account of the manner and circumstances under which the vessel grounded. The substance of that testimony is, that the vessel being on her passage from *New-York* to *Kinderhook*, late in the month of *November*, 1800, proceeded on the passage to *West*

*Camp*, where the vessel came to, from thence they weighed anchor and beat against the wind; from the lateness of the season, and for fear of ice, the captain was anxious to make *Livingston's* dock, which was considered a place of safety, and at which they had nearly arrived, when the accident happened; that the wind was light and variable, but sufficient to enable them to make considerable progress, and would have been sufficient, if it had continued, to have enabled them to have reached the dock, in a few more tacks; they were standing for the west shore, and had approached it, as near as was usual and proper, when they put down the helm to bring her about, the jib sail began to fill, the vessel partly changed her tack, when the wind suddenly ceased blowing, and the headway, under which the vessel was, shot her on the bank. Captain *M'Kean* states, that he was well acquainted with the shore, and had before approached as near as he did then, when beating to windward; and that, when standing for the west shore, he had wind enough to enable him to manage the vessel with safety; that as the water fell, the stern of the sloop settled, and did not rise until flood tide, in consequence of which, the water rushed in at the windows, and thereby the plaintiff's goods were wet and damaged. He states, distinctly, that the sudden and entire failure of the wind was the sole cause of the vessel's grounding.

The case of *Amies v. Stevens* (1 *Str.* 128.) shows that a sudden gust of wind, by which the hoy of the carrier, shooting a bridge, was driven against a pier and overset, by the violence of the shock, has been adjudged to be the act of God, or *vis divina*. The sudden gust, in the case of the hoyman, and the sudden and entire failure of the wind sufficient to enable the vessel to beat, are equally to be considered the acts of God. He caused the gust to blow in the one case; and in the other, the wind was stayed by him.

It has been said, that the captain was guilty of negligence in attempting to beat, and in approaching the

shore as near as he did when the disaster happened, the wind being, as he states, light and variable.    It may be observed, that the master had his choice of alterna-tives, either to improve the wind he then had, in order to reach a place of safety, or to be exposed, in the middle of the river, to the effects of ice.    The season of the year, and the interests of all concerned, justified the captain in at-tempting to reach *Livingston's* dock.    It was not, as I re-collect, pretended, on the trial, that his conduct was im-proper and unusual, in approaching the shore as near as he did on the tack in which the vessel grounded; at all events, the case does not show that the judge expressed any opinion on that point; and the plaintiff must have had the full benefit of that objection to the captain's con-duct.    I should undoubtedly have been of opinion, as the captain was situated, taking into view the lateness of the season, the narrowness of the channel, and the fact, that he was not nearer the shore than is usual and cus-tomary in beating, that he was not guilty of negligence or improper conduct in that respect.

No rule of law having been violated, in the charge to the jury, if there even were grounds for saying that there is some degree of negligence imputable to the master, that point has been under the consideration of the jury, or it was not insisted on before them, and in either case, when the plaintiffs attempt to fix the defendant with a loss from a very rigid rule of law, I should not disturb the verdict of a jury, to give them another opportunity to urge that objection.    In the case of the *Proprietors of the Trent Navigation* v. *Wood*,\* the vessel was sunk, by driving against an anchor, in the river *Humber*, and the goods were considerably damaged by the accident; it was not pretended by the counsel, that this was the act of God, and Lord *Mansfield* considered it the injury of a private man, within the reason of the instance of robbery.    *Ab-bott*, in his notice of this case, (*Abbott*, 256.) observes, that both parties were held to have been guilty of negli-

\* 3 *Esp. Cases,*
127.

gence, the one in leaving his anchor without a buoy, the other in not avoiding it; as when he saw the vessel in the river, he must have known that there was an anchor near at hand; or if it was to be taken, that negligence was imputable only to the master, who had left his anchor without a buoy, that he was answerable over to the master and owners of the vessel, whose cargo had been injured. Again, he observes, (p. 227.) that if a ship is forced on a rock or shallow, by adverse winds, or tempests, or if the shallow was occasioned by a recent collection of sand, where ships could before sail with safety, the loss is to be attributed to the act of God, or the perils of the sea. Upon a position so plain, in my apprehension, as that the sudden cessation of a wind which was competent, at the very moment when the vessel began to come about, for the avoidance of the shoal, was the act of God, and did not arise from the fault or negligence of man, I am at a loss for further illustration.

The second point, on which a new trial is sought, was fairly and fully before the jury; and without entering upon it further, I cannot but express my perfect concurrence in opinion with them; the master did every thing which could reasonably be expected of him, to prevent the vessel from sinking. Accordingly, my opinion is against a new trial.

THOMPSON, J. VAN NESS, J. and YATES, J. concurred.

KENT, Ch. J. I concur in the general doctrine, that the sudden failure of the wind was an act of God. It was an event which could not happen by the intervention of man, nor be prevented by human prudence. But I think here was a degree of negligence, imputable to the master, in sailing so near the shore under a "light, variable wind," that a failure in coming about, would

ALBANY,
August, 1810.

cast him aground.  He ought to have exercised more caution, and guarded against such a *probable* event, in that case, as the want of wind to bring his vessel about. A common carrier is only to be excused from a loss happening in spite of all human effort and sagacity.  (*Trent Navigation* v. *Wood*, 3 *Esp. N. P.* 127.)  A *casus fortuitus* was defined in the civil law to be, *quod fato contingit, cuivis diligentissimo possit contingere.*  But as this point does not appear to have been particularly urged at the trial, and the verdict negatives the charge of negligence ; and as the responsibility of common carriers may be deemed sufficiently strict, I am content not to interfere with the verdict, though I think that the evidence would have warranted the conclusion of negligence to a certain extent.

Judgment for the defendant.