Richardson, J.,
dissenting. The charge against the defendants is, that they have not delivered the goods put on board their boat. The defence is, that the delivery was prevented by the act of God — the unavoidable snagging of the boat; her consequent sinking in the river, and loss of the cargo; which, therefore, could not be delivered. The rejoinder is, that although the boat was snagged and partially sunk, yet the cargo' remained entire, and might have been delivered, though wet and much injured. The rule of law is plain: if the boat was unavoidably sunk, by an unknown snag, and the cargo thereby lost, the carrier is ex *122 cused from the delivery, and the justification of the carrier turns upon the term ‘ lost;’ not upon the snag piercing the boat — nor upon her consequent depression in shallow water, — nor yet upon the boat being disabled. These must be now assumed to be the acts of God. The boat stood immovable, as if inextricably stranded; but the loss which excuses the carrier, must still, in the words of Chancellor Kent, (vol. 3, 216) be “ a loss, happening in spite of all human effort and sagacity.” And it is not a novel occurrence, or an array of difficulties, that can rid the carrier of this severe but wholesome accountability. Upon the same doctrine of common carriers, Chancellor Kent says, p. 213, “ the master is bound to take all possible care of the cargo; and he is responsible for every injury which might have been prevented by human foresight and prudence,” &c.; “ he is chargeable with the most exact diligence.” Upon these two enactments — for they stand, for simplicity and clearness, in our laws, like express statutory provisions; and upon their strict application to every part of the case before us, and every parcel of the cargo, our decision is to turn. And my opinion must grow out of their application to the extraordinary facts, that have left the Atalanta and her cargo, neither sunk nor stranded, but yet fast moored in the channel of the river. This is probably the first instance, in which a carrier, having his boat merely snagged in our fresh water rivers, has claimed to be excused from the delivery of all the goods in the hull of his boat, wet or dry, as if the boat had sunk to the bottom of the ocean, or had been consumed, cargo and all, by lightning. To apply a rule without its meaning, is merely spurious reasoning. The rule of law, which fixes the great liability of carriers, must be regarded with its reasonable limitations; its rationale suggests its proper application, at every turn of the facts. The carrier is excused, by the act of Providence, for so much, be it more or less, of the cargo, as is lost or destroyed, or has been the natural and direct consequence of the act, which is pleaded in excuse. For instance, the carrier cannot be entirely exempt from liability, because lightning has burnt the greater part of his cargo, and seared or scorched the rest; he must still deliver the goods that remain, in their damaged state, and would have a right to the *123 freight of the goods delivered, in specie. Such goods being delivered, bear freight; but if never delivered, the carrier becomes the insurer, and is liable for the goods, in their deteriorated value. But, to return: when a misfortune constitutes the excuse, such excuse is limited to the natural and essential consequences of such specific misfortune. So far, it is an estoppel to the claim for damages, but no farther. The misfortune must constitute a full excuse, amounting to an impossibility for the non delivery of any thing at all; or the carrier is still liable for whatever human power could have rescued. Now, apply this rule of law to the facts. — The boat was snagged on the 18th October, 1836, and sunk to the bed of the river; but her deck remained still a foot above water. Here was no entire loss: and the carrier must show how it became so, still by this act of God. The owner, Mr. Wright, was sent for; he came in eight days, and held a survey: in the mean time, nothing was done to save the goods.' The tow-boat and crew of fifteen men lay idle — the river falling too. The deck load was then sent to Cheraw, in the tow-boat: and why, I ask, was she not before, and afterwards too, employed in the sáme way? Next, O’Hanlon was sent for: he came late in November. In the mean time, and the second time too, nothing farther was done to save the goods. O’Hanlon advised that the boat might be raised: accordingly, they went to work, to raise her; but no attempt was made, at this third period, to save the goods in detail. The scheme may have been worthy of success, but the law of the case is still inflexible. Finally, they failed of raising the boat, and abandoned the attempt to save the cargo in that way, or in any other. At two periods — one, a year afterwards — some strangers went on board, and although the water was then five feet above the deck, they got out a small part of the cargo, valued at $500. How much more could have been fished up with hooks, or got out, when the water was six feet lower, and was a foot below the deck, no one can now tell: but all was not lost; attempts should have been made; and appearances indicate that much might have been saved by early exertions, and exact diligence and human power. Did the snag in the boat prevent such efforts ? Did the accident keep the hatches sealed up, all the time of such *124 delay ? Assuredly not. But here, the excuse is that O’Hanlon gave counsel to raise the boat, which kept up the indecision of the captain, and the delay in saving what might have been saved, by immediate exertions: and the end is, that the cargo still remains in the wreck. But, by the' rule 'of law, the carrier is bound to show thafi the delivery of every piece and parcel of the cargo was estopped, by the unavoidable occurrence of the boat’s sinking, or its unavoidable consequences; or else he must pay for so much as might have been still delivered, according to the diminished value of goods in such a state. And it is plain, that some of the goods now lost might have been saved by the captain and crew. The cargo then has not been all lost, by the natural consequences of the misfortune to the boat But, on the contrary, some, if not a good deal, have been added to the inevitable loss, by omissions, delays, and unlucky councils, which are entirely foreign to, and make no part of the true and natural effects of the specific misfortune* which is set up.as a justification . for the non-delivery of the entire cargo under deck; but which, in fact, is the excuse for the unfruitful delay that ensued. Upon the whole, then, my opinion is,'that the proper legal verdict should have been against the carriers, to a limited extent. That such a verdict would have been the only one concurrent with the just policy and objects of the strict and wholesome laws of common carriers; while the present verdict is against both. Fresh water carriers are not to get rid of their whole responsibility, because their boat sinks; when, in fact, the deck remains above water, and a part of the cargo may be saved. Such a measure of indulgence to erroneous conduct, would infract the legal principle, that nothing but the act of God can justify the non-delivery of the goods confided — but the act of God, or of the enemies of ¡the state ; and such examples may fritter away the rule itself, by /opening the way for plausible excuses, thus mixed up with the f true rule of law, for their shelter and introduction into common f practice. On the contrary, the law against common carriers ^ should be carried through every change of the case, and modifica- \ tion in the amount of their responsibility ; else the rule itself will 'soon yield to the popular arbitrament of each particular case, ac *125 cording to the merits or demerits of the carrier. It is very possible that I'take too strong a view of such consequences ; but “ obsta principiis” has its place in judicial opinions, and I would send this case back, for the reconsideration of a court and jury, for its magnitude — for its novelty— for its difficulties — and above all, for its principles of law; which may be easily confounded by the circumstantial facts of a case of such complex considerations, and be too little regarded, in the midst of so much to uphold the general course and conduct of the carriers; while they are clearly not enough to justify the non-delivery of the whole cargo under deck, and defeat the wholesome legal presumption against common carriers. Why were these goods left as bona wavata ?' might not the very crew, black and white, have returned the moment of her final abandonment, and helped themselves to the goods ? “ The books abound,” says Chancellor Kent, “ with strong cases of recovery against common carriers, without any fault on their part; and we cannot but admire the steady and firm support which the English courts have uniformly and inflexibly given to the salutary rules of law, on this subject, without bending to popular sympathies, or yielding to the hardships of a particular case,” &c. “ The rule makes,” he continues, “ the common carrier, in the nature of an insurer, and answerable for every loss, not to be attributed to the act of God, or public enemies.— It was introduced to prevent the necessity of going into circumstances impossible to be unravelled.”
Williams, for the motion.
Graham, contra.
It is in the spirit of those just observations of Chancellor Kent, that I would judge the present case and send it back, to be reconsidered, according to the well settled presumption of law, in all such cases; (see 2 Kent., 602-3) which throws the onus probandi on the carrier, to exempt himself from liability — 1 Term., 27, 33; 6 Johns., 160 ; 4 Bin. 127; Story’s Bail., 338. I would therefore say in this case, what we unanimously said in the case of Patton v. M'Grath, Dud. 161: “ let a jury reconsider the case.” Its very uncertainty is enough in this politic law of carriers, and casts the loss upon the carrier, lest greater evils should follow.