## BOYLE, et al. vs. M‘LAUGHLIN.

1817.
JUNE

Boyle
vs
M‘Laughlin

APPEAL from *Baltimore* County Court. This was an action on the case brought against the defendants, (now appellants,) as common carriers, for negligence in the transportation of flour, &c. The general issue was pleaded.

1. At the trial the plaintiff, (now appellee,) gave in evidence, that in the spring of the year 1813 the defendants formed a copartnership for the transportation of merchandize, as common carriers, from *Philadelphia* to *Baltimore*, and from the latter to the former, in packets and waggons, by the way of *Elkton* and *Christiana*, and caused notice to be given thereof by the following advertisement in the news papers of *Baltimore:*

"New Mercantile Line of *Philadelphia* Packets.

The subscribers respectfully inform the public that they intend running a line of packets to and from *Philadelphia* via *Elkton* and *Christiana*, for the transportation of goods, which will commence on Tuesday next. Persons sending goods by this line will be certain of a speedy and safe conveyance, as they have excellent warehouses at *Elkton* and *Christiana*, and good waggons engaged. As the proprietors of this line are about making arrangements with one of the *New York* lines, and may probably extend the connexion as far as *Boston*, they are induced to believe that the public will be materially benefited by its establishment, and respectfully solicit a share of their favours. A packet will leave the head of *Smith's* Dock every Monday, Wednesday and Friday."

He further gave in evidence, that he on the 21st day of October 1813, at the port of *Baltimore*, shipped on board one of the defendants' packets, then called *The Mercantile Line of Packets*, 500 barrels of good, sound, merchantable, superfine flour, to be carried and transported by the route in said advertisement mentioned, to *Philadelphia*,

Action against H and B as common carriers of goods, &c transported partly by land and partly by water, in packets and waggons, from *Baltimore* to *Philadelphia*, by the way of *Elkton* and *Christiana*, brought for negligence, &c in the transportation of flour, &c. Much evidence was given of the badness of the flour, and destruction caused to the flour at *Christiana*, (where it was delivered, to be taken therefrom in packets,) by a consideration be fresh, occasioned by a heavy fall of rain which overflowed the place where it was deposited. On various questions submitted upon the evidence, the court directed the jury, 1. That if the delay in the land transportation was altogether owing to the founderous condition of the public roads, H and B were excusable; but if it was to b. attributed to their taking more merchandize than they had the power or means to carry in the usual course of transportation, then they were inexcusable, and chargeable for the delay which had been so occasioned. 2. That the testimony offered by H and B. in relation to the fresh that happened at *Christiana*, was not to be regarded at all, because it did not legally excuse them from answering for any damage the flour had sustained by reason of the fresh. 3. That the testimony by them offered in relation to the damage which the flour sustained on board the schooner F, did not legally excuse them from answering for the damage thus sustained on board the schooner, and ought therefore to be wholly disregarded. 4. That if 97 barrels of the flour, shipped on board the sloop L, was sent to *Lamberton*, beyond its original destination, without the orders or authority of the plaintiff or his agent, H and B were liable; but not otherwise. 5. That if the delay in the whole line of transportation was occasioned by the act of God, such as adverse winds, the founderous situation of the roads unusually low tides of the ake, H and B were excusable; but if the delay was occasioned, or in so far as it was occasioned, by H and B taking a greater quantity of commodities than they had the means of transporting, or by the unskilful navigation of the vessels, or any other circumstances which could not be deemed the immediate and distinct act of God, or the enemies of the state, then H and B were chargeable for such delay 6 That if the agent of H and B did call for instructions at *Philadelphia*, on the agents of the plaintiff, relative to the sending the 97 barrels of flour to *Lamberton*, and received none, then H and B were justified in carrying the flour to *Lamberton*. 7 That the plaintiff was nevertheless entitled to recover, because such new engagement to carry the flour to *Lamberton* was no alteration or modification of the contract declared on, but an excuse for the nondelivery of the flour at *Philadelphia*, which it was proper should come from H and B, and was not necessary to be set out in the plaintiffs declaration. Certain declarations of H, made to persons applying to have goods transported, &c. of the press of business upon the concern, by reason of the great quantity of commodities which necessarily passed along the line, and the difficulty at that sea on of the year of transporting the same with usual expedition, and that all persons who sent commodities by the said line must stand the risk of delay on those accounts, but that the concern would do all in their power to transport the commodities without delay and with safety. There was no evidence that any such declaration was made to the plaintiff, (who was present when the application was made for the transportation of his flour,) or that he had any knowledge thereof—*Held*, that the evidence was inadmissible.

1817.

Boyle
vs
M'Laughlin

there to be delivered to *Benjamin Stephens*, his agent and consignee, he paying freight therefor. And at the time of shipping the same obtained from *Hugh Boyle*, one of the defendants, the following receipt or bill of lading: "Received, *Baltimore*, 21st of October 1813, of Captain *M'Laughlin*, on board *The Mercantile Line of Packets*, 500 barrels of flour marked M, which *we* promise to have delivered to Mr. *Benjn. Stephens* in *Philadelphia*, *(the dangers of the seas, capture, fire, leakage, breakage excepted,)* he paying freight for the same 80 cents per barrel.

*Hugh Boyle.*"

He further proved, that the flour was carried from *Baltimore* to *Elkton* in said packet, and was there landed on the 22d of October in the same year, and arrived at *Christiana*, (distant from *Elkton* 10 miles,) part on the 13th and part on the 15th of November following, where it remained till the first of December following. That during the time it so remained at *Christiana*, a small portion was in the company's warehouse, and the residue was piled up on the shore of *Christiana* Creek uncovered and exposed to the weather; that whilst it so remained on the shore a considerable rain fell, and occasioned an overflowing of the creek, by which means the flour got wet and much damaged. That on or about the first of December, 388 barrels of the plaintiff's flour were put on board the schooner *Friendship*, (hired in *Philadelphia* for the purpose, and not one of the regular packets.) by the defendants at *Christiana*, to be carried to *Philadelphia*. That said schooner, soon after leaving *Christiana*, grounded and half filled with water, owing to the unseaworthiness of the vessel, or the want of skill, or negligence of the captain, or to the vessel being overloaded, which grounding and sinking occasioned a further damage to the flour. He further proved that the said schooner *Friendship* arrived without further accident at *Philadelphia* on or about the 11th day of December aforesaid, and on or about the 15th of the same month, landed of the plaintiff's flour only 343 barrels which was delivered to *Benjamin Stephens*, the plaintiff's agent, by *Latimer* and *Murdock*, the defendants' agents, and was specially accepted by said *Stephens* under the reservations and conditions expressed in the following receipt, written by *Stephens*, dated *Philadelphia*, December 11, 1813, and addressed to *Latimer* and *Murdock*, viz. "The schooner *Friendship* having arrived here with some flour for me, being part of 500 barrels shipped to my address the 21st of October last, I will receive the same subject to my claim for damage for the short delivery, for the detention, and for the injury done to the flour." The flour so delivered was regularly surveyed and inspected before its removal from the wharf where it was landed, and was found to be much injured and damaged by the circumstances herein before detailed, in its transportation from *Baltimore* to *Philadelphia*—and *Stephens*, the consignee, sent the same to auction, where it was sold for very reduced prices in consequence of the said inju-

ry and damage; the residue of the flour by the *Friendship,* that is to say, 45 barrels, were never delivered but wholly lost to the plaintiff. He further gave evidence that 97 barrels of said flour shipped by him as aforesaid, were shipped by the defendants at *Christiana,* on board the schooner *Lettice,* (not a regular packet but hired for the occasion) on or about the 1st of December, which never was delivered a *Philadelphia* or any other place authorised by the plaintiff or his agent, but was wholly lost to the plaintiff. That the defendants shipped five barrels of said flour on board the *Kitty* and *Sally* at *Christiana,* which were never delivered to the plaintiff or his agent, but were wholly lost; and that ten barrels, the residue of the 500, were never forwarded or delivered to the plaintiff or his agent agreeably to the bill of lading, but were wholly lost. That at the time of the arrival of the plaintiff's flour at *Elkton* as aforesaid, flour and other merchandize had previously so much accumulated at that place by the undertaking of the defendants to transport and carry the same forward from *Baltimore* to *Philadelphia* by the same route, that the defendants were unable to transport the same in due and reasonable time, by means of the waggons and vessels which they had and kept employed for that purpose, from thence to *Christiana* and *Philadelphia,* and from that cause a delay of from 30 to 40 days occurred in the transportation of said flour. That at the time of the formation of the said co partnership for the transportation of goods and merchandize as common carriers, in March 1813, the coasting trade of the *United States* was nearly or entirely cut off, and as completely intercepted as it was at the time of the shipment of the said flour, and that the same difficulties and obstacles which existed to the transportation at the time of the shipping of the said flour also existed at the time of the establishment of the line, and none other. That while said flour was piled up as aforesaid, a heavy rain fell and created a great and unusual fresh at that season of the year, and that the said flour, so piled up on the shore of said creek, was by the falling of said rain and the overflowing of the creek greatly injured and damaged. That a sufficient number of waggons and packets or vessels for the transportation of the goods and flour aforesaid, might have been obtained and employed by the defendants during the period aforesaid, had they made exertions for that purpose. That the captain of the *Lettice* did not call at *Philadelphia* or apply to *Latimer* and *Murdock* for instructions relative to the destination of the flour of the plaintiff, but without further or other instructions than those given to him by *Nevin & Allen,* proceeded and delivered the flour to some person or persons in *Lamberton,* which said delivery was to a person not authorised to receive the same by the plaintiff, and of which delivery the plaintiff or his consignee had no notice, and such flour was never accepted or received by the plaintiff or his agents, and that the flour shipped on board the *Kitty* and *Sally,* or that transhipped on board the *Sampson,* has not

since been heard of by the plaintiff, and is wholly lost to him. That before the establishment of the said line in March as aforesaid, there had been no regular transportation by this route between *Philadelphia* and *Baltimore.* That there were other places at *Christiana* more elevated, where the flour might have been piled on the ground, where it would have been in no danger of having been overflowed by the said fresh, and which places were convenient for shipping said flour. That the quantity of goods ordinarily trans- ported by this route before the establishment of said line of packets and waggons by the defendants, was very in- considerable to what it was afterwards. That the usual time employed in transporting goods by this route from *Baltimore* to *Philadelphia* was from 5 to 15 days. That at the time of the arrival of the flour at *Elkton* the roads between that place and *Christiana* were in tolerable good order, and that if proper exertions had been made by the defendants the same might have been transported to *Chris- tiana* in 4 or 5 days, instead of 21 or 23 days which elaps- ed before the same was transported by the defendants from *Elkton* to *Christiana* as aforesaid. He further gave evidence that *Stephens*, the consignee, after writing said letter of the 25th of November 1813, went to *Christiana*, and there personally directed *Nevin* and *Allen*, two of the defendants, to send said flour to *Philadelphia* agreeably to the original bill of lading, where he *Stephens* would himself arrange and prepare the means of its further transportation should he determine to send the flour on to *New-York*. The defendants then gave in evidence, that the 500 bar- rels of flour mentioned in the plaintiff's declaration, arriv- ed in due season, in good order and well conditioned, at *Elk Landing* on the *Chesapeake* bay, and was there unload- ed for the purpose of being transported by land carriage across to *Christiana*, at the head of a small creek which empties into the *Delaware* bay, that being the ordinary route used by the defendants in the conveyance of goods from *Baltimore* to *Philadelphia.* That at the time when the said flour was shipped at *Baltimore*, it was a fact of general notoriety that the whole coasting trade of the *United States* was almost entirely destroyed and put an end to by the ships of war of the enemy, and that the transportation of goods and merchandize from one part of the *United States* to another was altogether inland; that in consequence of this great intercourse, thus carried on, there was a large accumulation of property at *Elk Land- ing*, and for the removal of which across the isthmus be- tween the *Chesapeake* and *Delaware* bays, the defendants employed more than 130 waggons, being all that they could procure for that purpose within the distance of 30 or 35 miles. That the usual number of waggons employ- ed by them for the conveyance of goods in ordinary times did not exceed from 12 to 20. That it was a fact gene- rally known that the roads between *Elk Landing* and

*Dfts ans?*

*Christiana* were much cut up and destroyed by reason of the many heavy loaded waggons daily passing over them at that time, insomuch that the travelling was thereby greatly retarded, as it often happened that a waggon with five horses could not carry more than eight barrels of flour, when the usual load in a different state of the roads was 20 barrels. That the flour of the plaintiff was sent from *Elk Landing* to *Christiana*, as soon as it was practicable under the existing and known state of things, and that there was no unnecessary delay, nor any default on the part of the defendants, or their agents or servants, and that the same was delivered at *Christiana* on the 13th and 15th of November in the year aforesaid, for the purpose of being put on board of boats or vessels to be carried to its place of destination. That for some time previous to the arrival of said flour at *Christiana*, there had prevailed strong westerly and nor'hwesterly winds, which caused the tides in the creek of *Christiana* to be so low that it was found impracticable for the vessels employed by the defendants to get up to the wharves to load; that owing to the prevalence of these winds, and lowness of the tides, by which even light vessels were prevented from reaching the wharves to receive their cargoes, there was a great and unexpected accumulation of flour and other property at *Christiana*, insomuch that all the warehouses of the defendants at that place were filled with commodities passing in a regular course of transportation by their said line, and it was found necessary to pile it away in a state of safety on the wharves adjacent to the place of shipment. That a part of the plaintiff's flour, to wit, about 200 barrels, were thus, with other flour belonging to other persons, piled away on a rising ground beyond the reach of ordinary and probable tides and freshes or inundations of the creek. That no other warehouses could be obtained in the said place as they were all occupied and full. That the said warehouses were substantial and good, and that in the ordinary and usual state of transportation, the warehouses of the defendants were greatly more than sufficient for the storage of goods conveyed by them, and that every precaution was taken by them to preserve the said flour from injury by its exposure, such as having planks and tarpoulins in readiness, and prepared to cover the same. That while the 200 barrels of the plaintiff's flour were thus situated, the residue being in the warehouses, a sudden, unusual and extraordinary fresh or overflowing, took place in *Christiana* creek, such as had not occurred for 20 years and upwards previous to that time, by which a part of the said flour, to wit, from 20 to 50 barrels were wetted and damaged, and a part, to wit, 10 barrels, were carried away by the force of the flood and entirely lost, it not being in the power of the defendants to prevent the same. That every means was afterwards used by the defendants to prevent and repair all the injury to the said flour by being wet as aforesaid, and that the said flour received no da-

mage whatever from rain or weather, or from any other cause than that which is here stated. That the whole of the flour of the plaintiff, except 10 barrels which had been swept away by the force of the current, were shipped on board of vessels on the 1st of December in the year aforesaid, that being the earliest period of time at which the vessels could reach the wharves for the purpose of being loaded, where only they could be loaded. That after the inundation aforesaid, and previous to the loading of the flour on board of vessels at *Christiana, Benjamin Stephens,* the consignee of said flour, came from *Philadelphia* to *Christiana,* and after an examination of the flour gave the following directions to the defendants: "To be delivered at *Lamberton* or *Bordenton* as *Latimer* and *Murdock* may direct," having previously written the following letter addressed to *Nevin* and *Allen,* the agents of the defendants at *Christiana,* dated *Philadelphia,* November 25, 1813. "Your favour of yesterday is just received. It is my intention to forward the flour (or most of it) to *New-York,* but as yet I have not made a contract with any of the lines. You will please direct the captain who brings it to call on the agents here, with whom orders will be left where to send it, so that there will be no detention. It will be either to *Lamberton* or *Bordenton.* I hope you will send it on without loss of time, as every day is of much importance in the present critical state of affairs." That 388 barrels, part of the said flour, were shipped and stowed in the usual and proper manner on board a good and sufficient vessel called the schooner *Friendship,* captain *Gillan,* to whom the following instruction was given, and who gave the following receipt, viz. To be delivered at *Lamberton* or *Bordenton,* as *Latimer* and *Murdock* may direct, &c. That the vessel called the *Friendship* proceeded without delay upon her said voyage, but on account of the continued lowness of the tides in *Christiana* creek, grounded at a short distance from the wharf at which she had been loaded. That she was got afloat again, and then proceeded some distance further down the creek on her said voyage, when for the same reason, and without any default on the part of the master and mariners, or others, she again grounded, by reason whereof, in the course of the night of the 6th of December, some of the planks of her bottom were strained, by which she leaked, and in consequence thereof filled with the water of the creek, without its being possible to prevent the same. That this unavoidable accident rendered it necessary that a part of the said flour, to wit, 110 whole and 9 half barrels should be immediately taken from on board the *Friendship,* and put on board the sloop *Sampson,* a good and sufficient vessel, which at that time happened to be lying aground, although light, alongside of the *Friendship.* That there was no other mode of disposing of the said part, and that it was accordingly immediately put on board the *Sampson,* with instructions to carry the same to

the only place to which the master would consent to carry it, viz. to *Lamberton* upon the *Delaware*, distant from *Philadelphia* about 30 miles. That all possible means were promptly used to discharge the water from the *Friendship* to get her off the bar on which she was lying, and to put her in a condition to resume her voyage with the residue of the flour. The water was accordingly discharged from her; that she was got off from the bar, and that after all proper measures were taken for preventing, as far as might be, any injurious effects to the flour which the water had reached, the schooner resumed her voyage aforesaid, with the said residue of the flour on board, and without delay or further accident arrived at *Philadelphia* on the 11th of December in the said year. That the said flour, viz. 343 barrels, on its being landed at *Philadelphia*, was afterwards sold by the consignee thereof at public auction, and produced the sum of $1,574 and 14 cents, according to the account of sales thereof. That the flour taken from on board the *Friendship*, and removed to the *Sampson*, was without delay transported and carried to *Lamberton*, and there delivered and safely landed, of which the said *Stephens* had due and proper notice. That the 97 barrels of flour, so as aforesaid shipped on board the sloop *Lettice*, were carried and taken to *Philadelphia*; and that the captain, after making inquiry to ascertain whether instructions had been left with *Latimer* and *Murdock* for the purpose of directing him to proceed with the said flour to *Lamberton*, or *Bordenton*, and finding that none such had been given, he prosecuted his voyage to *Lamberton*, and there delivered the said flour to ———— *Howell*, in whose warehouse the same was stored, and took a receipt therefor, which he afterwards delivered to *Latimer* and *Murdock*, and who communicated the same to the said consignee. That the 5 barrels so as aforesaid shipped on board the schooner *Kitty* and *Sally*, were delivered at *Lamberton*, of which the consignee was notified in due time; and that the remaining 10 barrels were entirely lost and swept away by the fresh and inundation that happened at *Christiana*, while the same was stored as aforesaid on the wharf at *Christiana*. They further gave in evidence, that no freight was ever paid to the defendants for any part of the flour thus transported as aforesaid. The defendants then prayed the court to direct the jury, that if the jury believe the evidence so as aforesaid offered by the defendants, the plaintiff is not in point of law entitled to their verdict for or on account of any part of the flour in his declaration mentioned.

The County Court, [*Bland*, A. J.] delivered the following opinion. This action is brought against the defendants as common carriers, to recover the value of 500 barrels of flour, which the plaintiff alleges they received and undertook to carry to *Philadelphia*. The plaintiff founds his right to recover on the following grounds, 1. That a part of the flour was materially damaged. 2. That another part

1817.

Boyle
vs
M'Laughlin

was swept away by a fresh, and so wholly lost. 3. That a third parcel was sent to *Lamberton* beyond its place of destination, without any orders or authority from the plaintiff, or his agent, and thus also wholly lost; and 4. That there was an unreasonable and injurious delay in transporting the flour from *Baltimore* to the place of its destination.

The plaintiff has urged that the testimony of the defendants, if believed by the jury, does not amount in law to such an excuse, arising wholly from the act of God, or the enemies of the Republic, as will bar him from claiming compensation for the injury he has thus sustained. The defendants have offered in evidence a great variety of circumstances which they have insisted shew conclusively that all the delay, damage and loss, which has been sustained, was entirely owing to causes for which they are not responsible.

In carrying our attention along the route which this flour was to travel, we find that the cause of complaint commences with the land transportation; there it is alleged the commodity was unreasonably retarded in its progress, or that it was not accelerated with that rapidity and despatch that it ought to have been. In reply it is said, that the road over which it was to pass was at that time so excessively bad, and so very founderous, that it was utterly impossible to get along any faster with that number of waggons and force of teams, which was commensurate to all the ordinary calls of that species of transportation.

It is said in the books, that when a highway becomes so out of repair, that travellers cannot pass along it, they will be justified in leaving it, and going upon the adjoining fields. There are many respectable authorities which lay down the law in this manner, and none of them make any distinction *as to the causes* which may have produced the founderous condition of the road, but whatever may have occasioned *such* impracticability, the traveller shall not in such case be deemed a trespasser by going upon the adjoining fields. Founderous roads seem to be thus considered in some degree as the act of God, and therefore as forming an excuse for a traveller who from *that cause* trespasses upon a neighbouring field. And upon the same principles, *such kind* of bad roads will in my opinion be an excuse for any delay occasioned thereby to a carrier, who is under a necessity of passing over them. I would here, however, observe, that my determination is founded upon the road's being in that condition properly called *founderous;* and that I wish to exclude from the grounds of my opinion those cases where the delay has been occasioned by obstructions or nuisances, such as felled trees, ditches, fences, and the like, made by *individuals* who may be prosecuted for such acts, as well by the public as by the person who has sustained any special damage, because *such cases* appear to me to give rise to a different train of reasoning, and therefore cannot be considered as falling altogether within the same principles of law applicable to the

case of a founderous highway. The impracticability of a road occasioned by the great and unusual number of passengers, is a kind of obstruction produced by the public for which the person injured has no remedy; it is, as to the individual so retarded, the immediate *act of the nation*, or *as it were* the act of God But where the carrier may recover damages for his delay, it would seem to be unreasonable that he should not answer over to the person who has suffered by such detention. I therefore think that the premises taken in the argument of this case from the case of *Amies vs Stevens*, 1 *Strange* 128, that where damage is occasioned by the act of God, *operating upon*, or *as secondary* to the act of *man*, which was the immediate causes of injury, is by much too large. But it would perhaps be correct to say, that in all cases where the *immediate* cause of injury or delay is a *public* or *national* act, as the erection of a bridge over a navigable river, or the like, *coupled* with an act of God or *physical impossibility*, as a *secondary* or *remote* cause, the carrier shall be excused. The roads are usually better in summer than in winter, and consequently the transportation of commodities will move more rapidly at one season than at another. And I deem it sufficient for the defendants if they show that their force of teams and waggons was adequate to the ordinary purposes of transportation in the common state of the roads; for a carrier is not bound to find a new carriage for every journey, or to provide new and additional force of teams for every change in the state of the highway. In this case, therefore, so far as the delay was occasioned solely and exclusively by the *founderous* condition of the roads, the defendants are not chargeable for such delay.

But on the other hand, if the delay in this stage of the progress of the flour was not occasioned solely and exclusively by the bad road, but in part by the defendants having received and undertaken to carry more commodities than they had the means of carrying, then they are chargeable; for if, by limiting themselves to a certain quantity of merchandise, they could have carried it in the usual and ordinary time, they were bound to do so. The law authorises them to refuse to take more than they have the means or the power of transporting; but if they do overburden themselves, and in consequence thereof any delay or loss occurs, they are liable I shall, therefore, as to this part of the case, give this direction to the jury—That if they shall believe that the delay in the land transportation was altogether owing to the *founderous* condition of the road, the defendants are excusable; but if they shall believe it was to be attributed to the defendants taking more merchandise than they had the power or the means to carry in the usual course of transportation, then they are inexcusable, and chargeable for the delay which has been so occasioned.

The next stage at which we are called on to attend to the situation of this flour, and to notice the conduct of

1817.

Boyle
vs
M'Laughlin.

these carriers, is at *Christiana.* This is by much the most important resting place of this eventful journey, and where we shall have less difficulty in apprehending and explaining the extent of the responsibility, and the principles on which it rests, than in moving over the ten miles of founderous highway. The defendants having established a line of communication between *Baltimore* and *Philadelphia.* by packets and waggons, advertised to all the world that they were prepared and willing to undertake the transportation of merchandise in *safety,* by packets sailing from *Baltimore* to *Elkton,* where they had good and sufficient warehouses whence their waggons will convey it to *Christiana,* where also they have ample warehouses in which it may be *safely* stored until it is put on board of packets, and transported by water in *safety* to *Philadelphia.* In addition to this advertisement it further appears, that such was the usual and constant mode of transportation along this route, on which, and with reference to which, the contract in this case was made. But in this case the greater part of the flour, on its arrival at *Christiana,* was put upon an elevated place on the wharf, wholly uncovered, and in every respect unprotected from the weather. And while it lay there, a fresh arose in *Christiana* creek, by which a great part of that, which was so exposed, was damaged, and some of it swept quite off. The fresh, say the defendants, occasioned this damage and loss, and the fresh was surely the act of God. But how came the flour to be thus carelessly disposed of and exposed to damage and perils from every quarter and of every sort? And why was it not stored? It was impossible, it is said, to procure any kind of warehouse room for this flour, because, owing to the very great and unusual press to have commodities transported along this line, in consequence of the coasting trade being cut off by the public enemy, every warehouse that could be had was stored full. But these carriers knew the state of public affairs; indeed this line of communication was established, it is said, in consequence of the state of the country, and became unusually crowded and profitable, chiefly from the same cause. These defendants knew, and were bound to know, the extent and capacity of their means of transportation; and the sufficient capacity of their warehouses at *Elkton* and *Christiana* was a most essential and important portion of their means of transportation in *safety,* which they knew, undertook for, and consequently insured. They were not bound to take more than their warehouses could contain, any more than to receive on board their packets so much as might sink them; and having the right, it was their duty to refuse to receive and transport, under the *general pledge and responsibility* of carriers, any more commodities than they had the means of conveying *in safety.* But who gathered together, and persevered in gathering together, those enormous bulks of commodities at *Elkton* and *Christiana?* Who profited by it? Who

induced the public and this plaintiff to believe that the goods they received to carry would be placed in warehouses? *Why the defendants*. The defendants, therefore, are chargeable for the damage and loss that has been thus sustained. The defendants cannot avail themselves of any thing like a half way excuse or apology—the loss must have been occasioned altogether by the act of God, and *as such* amounts to a complete and absolute *excuse*, or it is none at all. But here the defendants were in fault in so accumulating commodities on their own hands that they could not store this flour, and are therefore chargeable and consequently cannot be allowed to give in evidence the *manner* in which the loss was occasioned, in *mitigation* of damages. Upon this subject, therefore, I shall direct the jury. that the testimony, so far as it relates to this part of the case, is not to be regarded at all, because, if true, it does not amount to a legal excuse.

After the fresh in *Christiana* Creek was over, so much of the flour as was left, and in such condition as it was left, was again put in motion toward its place of destination—and the misfortunes which attended that part of this residue which was put on board the schooner *Friendship*, forms the next distinct branch of this case to which our attention has been particularly directed. It is alleged, that at the time this vessel commenced her voyage, the tide in *Christiana* Creek was unusually low, owing to the prevalence of the westerly and north westerly winds; that after she had gone a short distance she grounded, but was got off in safety, and then proceeded some distance further down the creek, when she again grounded, whereby some of the planks in her bottom were strained, so that she leaked and filled with water, in consequence of which a part of the flour was transhipped on board the sloop *Sampon* bound to *Lamberton*, where it was taken; and that after some time the schooner *Friendship* was again got afloat, and proceeded to *Philadelphia*, where she delivered that which remained on board of her, to the consignee, in a damaged condition. For all which the defendants say they are not answerable, because the low tide was the act of God, and *that act* produced the damage and loss. In the case of *Amies vs. Stevens*, where in coming through a bridge, by a *sudden gust* of wind the *Hoy* was sunk, and the goods were spoiled, the carrier was held not to be answerable, "for, said *Pratt*, Ch. J. though the defendant *ought not* to have ventured to shoot the bridge, if the general bent of the weather had been tempestuous, yet this being only a *sudden gust* of wind had entirely varied the case." The sound sense of what is here said seems to me to amount to this, that where the *general bent* of the weather is tempestuous, the carrier is not only excusable, but he is commendable in *delaying* the further prosecution of his voyage until the stormy state of things shall pass away or subside; but that, if when the general bent of the weather is tempestuous, he does notwithstanding persist in prosecuting his voyage, as if in such

a state of things he had undertaken to shoot the bridge, and his vessel is sunk, he is answerable. The carrier is not bound to encounter any unusual or extraordinary perils occasioned by the act of God, but if he does so, he proceeds at his own risk. And again, a carrier takes upon himself the knowledge and the hazard of all the difficulties and perils of the route in which he proposes to go, except those proceeding *immediately and solely* from the act of God, or the enemies of the country; as where there was an anchor thrown into the river against which the vessel of the carrier was driven and sunk, he was held to be answerable, for it was his negligence in not inquiring more minutely about this new danger in that navigation, which he undertook to know. For as to all these and such circumstances, the carrier is, to all intents and purposes, an *insurer.* He contracts that the goods shall be carried *in safety*, and nothing will excuse his failing in the exact and punctual fulfilment of this contract, but his being prevented by the act of God, or the enemies of the country. The application of these principles, thus illustrated, to the predicament of the schooner *Friendship*, will, it appears to me, leave little or no doubt about the extent of the liability of these carriers. If the prevalence of the westerly and north-west winds had occasioned an uncommonly low tide in *Christiana* Creek, and thus, in an *extraordinary manner*, increased the perils of that navigation, these carriers were not bound at their *own risk* to encounter these *new* and *extraordinary* dangers; they would have been excusable in making a reasonable delay until these *additional and temporary* perils had passed away. But inasmuch as they did proceed, they prosecuted the voyage at their *own risk*; they knew, or they took upon themselves the knowledge of the changes in the navigation which had been thus occasioned, and they voluntarily proceeded; consequently they moved forward at their own risk. I shall therefore direct the jury, that the evidence offered as to this part of the case, if true, does not legally excuse the defendants from answering for the damage which the flour sustained on board the schooner *Friendship*, and is therefore to be wholly disregarded.

The attention of the court has been called to another parcel of this flour, which was put on board the sloop *Sampson*, and another vessel, and sent to *Lamberton*, as is alleged, without any orders or authority from the plaintiff or his agents. As to which, if the jury shall believe, from the evidence, that this parcel of flour was sent to *Lamberton* beyond its original destination, without the orders or authority of the plaintiff, or his agents, the defendants are liable, otherwise not. But as some evidence has been offered relative to an authority derived from the agent of the plaintiff, the legal import of which the court is called upon to declare, I will therefore further direct the jury, that if they shall believe the testimony offered by the defendants, relative to the sending of the 97 barrels of flour to *Lamberton* or *Bordenton*, and that the agent of the defendants did

call for instructions at *Philadelphia*, on *Latimer* and *Murdock*, and received none, then the defendants were justified in carrying the flour to *Lamberton*; otherwise not.

And finally, the court is requested to take a general view of this eventful and luckless voyage, and say whether there has not been, in point of law, an injurious and inexcusable delay in the transportation of this flour from *Baltimore* to *Philadelphia*. This is a matter which in this case is so intermingled with all the transactions of the voyage, that the court must leave it in part to the jury to determine. My direction will therefore, here, as in the first question about delay, be hypothetical. If the jury shall believe that the delay was occasioned by the acts of God, that is such as head winds, the founderous condition of the roads, unusually low tides, or the like, the defendants are excusable; but if they shall believe that the delay was occasioned, or in so far as it was occasioned, by the defendants taking a greater quantity of commodities than they had the means of transporting, or by the unskilful navigation and grounding of the vessel, or by any other circumstance which cannot be deemed the immediate and distinct act of God, or the enemies of the country, then the defendants are chargeable for such delay to such amount as the jury shall deem reasonable.

I have taken a survey of this case in its several stages and by parts, because it did not appear to me to be susceptible of being properly taken in the aggregate from any point of view but the one respecting delay; for the flour, when it arrived at *Christiana* where its misfortunes commenced, was separated into several parcels, each parcel was involved in a different predicament, and consequently the principles of law applicable to each was in some respects dissimilar.

The Court therefore refused to give the direction prayed for by the defendants; but did direct the jury, that if they believe that the delay in the land transportation was altogether owing to the founderous condition of the public roads, the defendants are excusable; but if they shall believe that it was to be attributed to the defendants taking more merchandize than they had the power or means to carry in the usual course of transportation. then the defendants are inexcusable, and chargeable for the delay which has been so occasioned.

And the court did further direct the jury, that the testimony offered on the part of the defendants, in relation to the fresh that happened at *Christiana*, was not to be regarded at all, because it did not legally excuse them from answering for any damage the flour had sustained by reason of the said fresh. And did also direct the jury, that the testimony offered by the defendants, in relation to the damage which the flour sustained on board the schooner *Friendship*, did not legally excuse the defendants from answering for the damage thus sustained on board the said

schooner, and ought therefore to be wholly disregarded.

And the court did further direct the jury, that if they believe from the evidence that 97 barrels of flour shipped on board the sloop *Lettice*, was sent to *Lamberton*, beyond its original destination, without the orders or authority of the plaintiff, or his agent, the defendants are liable, but not otherwise.

The court did moreover direct the jury, that if they shall believe that the delay in the whole line of transportation was occasioned by the acts of God, such as adverse winds, the founderous situation of the roads, unusually low tides, or the like, the defendants are excusable; but if they shall believe that the delay was occasioned, or in so far as it was occasioned, by the defendants taking a greater quantity of commodities than they had the means of transporting, or by the unskilful navigation of the vessels, or any other circumstances which cannot be deemed the immediate and distinct act of God, or the enemies of the republic, then the defendants are chargeable for such delay. The defendants excepted.

2. The defendants further prayed the opinion of the court to the jury, that if they shall believe the testimony offered by the defendants relative to the sending of the 97 barrels of flour to *Lamberton*, or *Bordenton*, and that the agent of the defendants did call for instructions at *Philadelphia*, on *Latimer* and *Murdock*, and received none, then the defendants were justified in carrying the flour to *Lamberton*, otherwise not. This direction the court gave. The *plaintiff* excepted.

3. In addition to all the matters and things herein before stated, relative to an agreement made between the consignee and *Nevin* and *Allen*, two of the defendants, who were the agents of the defendants at *Christiana*, by which they were to send on the said flour to be delivered at *Lamberton* or *Bordenton*, as *Latimer* and *Murdock*, the agents at *Philadelphia*, might direct, the defendants offered this further evidence, that it was then agreed at *Christiana* that the defendants were to receive an additional compensation of ten cents per barrel. The defendants then prayed the opinion of the court, and their direction to the jury, that if they believed this last evidence so offered on the part of the defendants, the plaintiff is not entitled to recover in the present form of declaring in this cause. Which opinion and direction the court refused to give; but directed the jury, that if they should believe the testimony offered by the defendants, relative to the sending of the flour to *Lamberton* or *Bordenton*, the plaintiff is nevertheless entitled to recover; because such new engagement to carry the flour to *Lamberton* or *Bordenton*, is no alteration or modification of the contract declared on, but an excuse for the non-delivery of the flour at *Philadelphia*, which it is proper should come from the

defendants, and is not necessary to be set out in the plaintiffs' declaration. The defendants excepted.

4. The defendants then, in addition to the preceding evidence, and also in addition to the following letter, (previously offered in evidence, from *Boyle*, one of the defendants, to *Hollingsworth* and *M'Kinsey*, others of the defendants, dated *Baltimore* the 21st of October 1813, which was carried by the plaintiff to *Elkton*, with a knowledge of the contents,) viz. "This will be handed you by Capt. *M'Laughlin* of this place, who has shipped 500 barrels flour for *Philadelphia* on board Capt. *Wood Abrams*' vessel. I have no doubt you will do what is in your power for him. Capt. *Abrams* went off without his invoice; Capt. *M'Laughlin* will give it you. No vessels will be loaded here unless those belonging to the line, until you are clear. You may also inform the waggoners, if it will be any encouragement, that no more flour, than what is already contracted for, will be forwarded under 90 to 100 cents. Would also recommend even our own vessels detained with their loads, unless you have back freight, until you get clear of what is at present on hand. The tobacco forwarded on board Capt. *Mitchell* is subject to your last regulation. The line pays no demurrage." They then offered to prove by a competent witness, who during the year 1813 was the clerk of the defendants at *Baltimore*, that *Boyle*, one of the defendants, was the agent at *Baltimore* of the said concern. That an office was kept by *Boyle* during the said year on *Spear's* wharf in the said city, for the reception of applications for the transportation of commodities by the said mercantile line, by the way of *Elkton* and *Christiana*. That the witness was in almost constant attendance with *Boyle* in the said office, during the hours of business; and that a short time before, at and after the 21st of October in the said year, it was the constant practice of *Boyle*, when such applications were made to him, while the witness was so with him in the said office, to inform the applicants of the press of business upon the concern, by reason of the great quantity of commodities which necessarily passed along the said line, and the difficulty at that season of the year of transporting the same with the usual expedition, and that all persons who sent commodities by the line must stand the risk of delay on those accounts, but that the concern would do all in their power to transport the commodities, which it might be thought proper to intrust to them, without delay, and with safety. That the plaintiff was present when the application was made for the transportation of the flour aforesaid; but that the witness did not particularly recollect that any such declaration was made to the plaintiff, or that he had any knowledge thereof. But the plaintiff objected to this testimony for any purpose whatever. And the court was of opinion, that it was not proper to go to the jury for any

1817.

Boyle
vs
M'Laughlin

purpose, and therefore rejected it. The defendants excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued on the *first, third,* and *fourth* bills of exceptions, before CHASE, Ch. J. and BUCHANAN, EARLE, JOHNSON, MARTIN, and DORSEY, J.

*Harper,* for the Appellants, contended, 1. That the evidence does not support the action, because the contract alleged in the declaration, and the contract proved, are not the same contract, being between different parties. For which reason the general prayer of the defendants below, in the *first* bill of exceptions, ought to have been granted.

2. That the direction of the court in the *first* bill of exceptions, relative to the fresh at *Christiana,* is erroneous; because the fresh was the act of God, and so far as it operated, did excuse the defendants.

3. That the direction in the same bill of exceptions, relative to the damage sustained on board of the schooner *Friendship,* is erroneous, because the damage was caused by the lowness of the water, and the consequent grounding of the vessel, which was the act of God.

4. That the opinion contained in the *third* bill of exceptions is erroneous, because the agreement for 10 cents per barrel additional freight, operated as a new contract, which waived or modified, and in either case annulled the old one, and ought therefore to have been declared on.

5. That the evidence stated in the *fourth* bill of exceptions ought to have been left to the jury—1. Because it furnished proper ground for inferring the fact which the defendants wished to prove. 2. Because that fact was material and proper to be proved.

*Martin* and *Winder,* for the Appellee, referred to *Amies vs. Stevens,* 1 *Stra.* 128. 2 *Com. on Cont.* 322, 323. *Lyon vs. Mells,* 5 *East,* 428, and *Colt vs. M'Mechen,* 6 *Johns. Rep.* 160.

THE COURT concurred in the opinions of the County Court in all the bills of exceptions taken on the part of the defendants below.

JUDGMENT AFFIRMED.