## Case No. 1,412.

### BINFORD v. The VIRGINIA.

[1 Quart. Law J. (1856,) 153.]

District Court, E. D. Virginia.

CARRIERS OF GOODS—NOTICE TO CONSIGNEE—DUE DILIGENCE.

1. It seems that apart from any agreement between a common carrier and the consignee of goods entrusted to his care, the strict rule of the common law with respect to the liability of other carriers, is not applicable to steamers and railroads that have a regular time of arrival and departure.

2. When the question of diligence arises at all in the case of a carrier, he is bound, like other bailers for hire, warehousemen or wharfingers, to the exercise of due diligence only.
[See note at end of case.]

[In admiralty. Libel by Binford, Mayo & Blair against the steamer Virginia, belonging to the Union Steamship Company, for injury to goods shipped. Decree for respondents.]

Gregory & Steger, for libellants.
Crump & Day, for defendants.

HALYBURTON, District Judge. In this case the libellants allege that certain goods were shipped on board the steamer Virginia at Philadelphia, to be carried thereon to Richmond, and there delivered, to the libellants in good order and condition, and that said goods were not so delivered, but were in a damaged state, for which compensation is claimed. To prove the delivery of the goods at Philadelphia, a bill of lading is offered as evidence, which purports to be signed by J. Cummings. The respondents do not admit the delivery of the goods or the authenticity of the signature of Cummings, or his authority to sign a bill of lading for the Union Steamship Company, which they say can only be proved by an instrument under seal, in which way, only, it is alleged the agent of a corporation can be appointed. There is no evidence in the cause that we have seen

to prove that the Union Steamship Company is a corporation; but if that fact had been shewn, it would not affect the case. We think it sufficiently shewn that the goods were delivered as alleged in the libel, that J. Cummings signed the bill of lading, and that he was duly authorized to do so. It is now quite settled in this country, that a corporation may appoint an agent by vote, and also that an agency may be implied in the case of a corporation as in other cases. The dealings of the agent of the company in reference to these goods in Richmond after their arrival, together with the circumstances, are sufficient to satisfy us that Cummings had authority to sign the bill, and if this were not so, they amount to such a recognition of his acts by the company as would bind them by implication.

It was also proved that the goods were not delivered to the libellants in good order and condition, according to the contract, but were wet and damaged by a freshet in James river, whilst they were under a shed belonging to the company, or at least were in custody. This brings us to the inquiry whether the goods were delivered to Binford, Mayo & Blair at Richmond, according to their promise contained in the bill of lading or not. It seems to be settled law in this country, that where the carriage is by land, the carrier is bound to deliver the goods to the owner personally, or to his agent at his residence or place of business, but if the carriage be in foreign or probably in our own ships and vessels, as they must stop at the wharf, it is sufficient if notice be given of the arrival of such vessels at the wharf, and delivery be made there on request. These general rules, however, may all be modified and controlled by the usage of particular places, as is shewn by numerous decisions in relation to this point, from the earliest to the latest, both English and American. See Golden v. Manning, 2 W. Bl. 916; Garside v. Proprietors of Trent & M. Nav. Co., 4 Term R. 581; Hyde v. Same, 5 Term R. 389; Bourne v. Gatliffe, 42 E. C. L. 337; Gibson v. Culver, 17 Wend. 305; Thomas v. Boston & P. R. Corp., 10 Metc. [Mass.] 472.

In the case of Gibson v. Culver, cited with approbation by Judge Story, it was decided in conformity with the general principle laid down in the cases above cited and in other cases, that notice might be rendered unnecessary by uniform, continued and well known usage to that effect; and in the case in 10 Metc. [Mass.] the court decided that "proprietors of a railroad, who transport goods on their road and deposit them in their warehouse, without charge, until the owner or consignee has a reasonable time to take them away, are not liable as common carriers for the loss of goods from the warehouse, but are liable as depositaries only for want of ordinary care." Hubbard, Justice, pronouncing the opinion of the supreme court of Massachusetts in that case, said: "From the very nature and peculiar construction of the road, the proprietors cannot deliver merchandize at the warehouse of the owner, when situated off the line of the road as a common waggoner can do. To make such a delivery, a distinct species of transportation would be required, and would be the subject of a distinct contract. They can deliver it only at the terminus of the road, or at the given depot where goods can be safely unloaded and put in a place of safety. After such delivery at a depot the carriage is completed. But owing to the great amount of goods transported, and belonging to so many different persons, and in consequence of the different hours of arrival, by night as well as by day, it becomes equally convenient and necessary, both for the proprietors of the road and the owners of the goods, that they should be unloaded, and deposited in a safe place, protected from the weather and from exposure to thieves and pilferers. And where such suitable warehouses are provided, and the goods, which are not called for on their arrival at the places of destination, are unloaded and separated from the goods of other persons, and stored safely in such warehouses or depots, the duty of the proprietors as common carriers is, in our judgment, terminated. They have done all they agreed to do; they have received the goods, have transported them safely to the place of delivery, and, the consignee not being ready to receive them, have unladed them and put them in a safe and proper place for the consignee to take them away, and he can take them at any reasonable time. The liability as common carriers being ended, the proprietors are by force of law depositaries of the goods, and are bound to reasonable diligence in the custody of them, and consequently are only liable to the owners in case of a want of ordinary care." From the principle adopted in this case, which seems to have been elaborately argued and maturely considered, and to be sustained both by reason and authority, we are not disposed to dissent, so far at least as it is applicable to the case before the court. That the same person may be at the same time both a carrier and a warehouseman, and that his responsibility and liability as carrier may be terminated by a delivery of the goods into his own warehouse, without any special agreement to that effect, and by force of usage, is clear from many authorities, particularly the cases of Garside v. Proprietors of Trent & M. Nav. Co., already mentioned, and Allan v. Gripper, 2 Cromp. & J. 218. Whether such liability be terminated or not in any particular case may depend, in the absence of any express agreement, upon what may reasonably be supposed to have been the understanding of the parties, to be inferred from usage and other circumstances.

Steamboats and railroad cars have fixed periods of arrival and departure, and cannot, therefore, wait to give notice before delivery

of the cargo and this is known to those who employ them beforehand.[1] The convenience and the interest of the public, and especially of the merchants, are greatly promoted by regularity and dispatch in these matters. There would be much more inconvenience, not only to proprietors of steamboats and railroads, but to the public, in requiring them to give notice to the owners of all merchandize on board, than in requiring the owners to take notice of the arrival of the boat or car, provided that the proprietors of the boats and cars are required to take proper care of the goods for a reasonable time after delivery; and if, in addition to those considerations, there be a uniform, continued, and well known custom for boats to begin to unlade immediately after their arrival, without giving any notice, and if the owners or consignees be not present to receive their goods, to deposit them in a warehouse or some secure place to be safely kept until they shall be demanded, we can see no sufficient reason why, in the absence of express words to the contrary, the court should not regard it as the understanding of the parties to a bill of lading that the goods shall be so delivered and deposited, and the risk of the carrier in that capacity be ended, he being bound as a warehouseman to take care of them for a reasonable time thereafter. Such a construction of the agreement would seem at least to be proper in all cases where the owners of goods might and would have received them, if they had made a demand for them.

There seems, too, good ground for maintaining that, apart from any supposed agreement, the strict rule of the common law with respect to the liability of other carriers is not applicable to that class of whom we are speaking. The rule was established for the protection and convenience of the public, and should not be extended to cases very different from those it was meant to embrace, and where its effect would be the very reverse of what was intended. "Cessante ratione cessat et ipsa lex." If the proprietors of steamboats and railroad cars were held in all cases to the strict responsibility of ordinary carriers until notice could be given to the consignees of goods, and what might be regarded as a reasonable time afterwards allowed to take the goods away, the inconvenience and the loss arising from the delays which would thereby be occasioned, and the increased cost of transportation, would be very much greater, we believe, than are likely to result from the rule of law, as we here suppose it to be.

In the case before the court, it appeared from the evidence, that the usage was uniform, and had been so for years, for steamers to unload as soon as it was convenient to them after they were moored at the

wharf, and without giving notice to the owners or consignees of the goods, to deposit them under a shed where they were protected from bad weather and by a guard from thieves, when the owners or consignees, or some agent authorized, or supposed to be authorized by them, were not present to demand them. It was usual to deliver goods to any licensed drayman or teamster who might be ready to take them, but this was done for the benefit of the consignees, and by what seems to have been regarded as implied authority from them. These carriers were regarded as the agents of the consignees, paid by them, and made responsible by them for any damage done to the goods while in their custody, and not as agents for the steamboat or railroad companies. In this case we regard the delivery of the goods, so far as the steamboat company were concerned as carriers, as having been complete when they were placed under the shed. The transit was at an end, and the company were bound no longer to take care of the goods as carriers, but as warehousemen, or other depositaries.

They are, of course, answerable for ordinary negligence, but the burthen of proving that is on the libellants; and according to the case of Muddle v. Stride, 38 E. C. L. 163, if it be left doubtful, by evidence, whether there was negligence or not, the libellants must fail. This was an action at law against carriers by water for damage to goods, and the lord chief justice, in delivering the opinion of the court, said to the jury: "If, on the whole, in your opinion it is left in doubt what the cause of the damage was, then the defendants will be entitled to your verdict, because you are to see clearly that they were guilty of negligence, before you can find your verdict against them."[2]

If that opinion of the chief justice be correct, there can be no doubt what the decision of the court ought to be in this case, because, certainly, if we look at the whole evidence, a clear case of negligence does not

---

[1] In this case the steamer arrived after the usual time.

[2] In this case the evidence for the plaintiff was that the packages damaged were put on board in good order. The vessel met with rough weather, and on her arrival off the port of Dover (her point of destination) the captain was signalled that it would be dangerous to enter, and in consequence went to Margate and remained there. The goods were afterwards sent on board another vessel from Margate to Dover, and upon being opened were found damaged. The declaration alleged that the defendants had not used due care, and the defendants pleaded not guilty. It was upon this state of the pleading that Lord Denman gave his charge. But the case, even if it can be cited as authority for the opinion expressed, seems to have been misreported, because the verdict of the jury under the instruction, and upon the evidence detailed, was for the plaintiff in the amount of damages claimed by him, and the verdict stood; and if we take the opinion of the court as it was expressed, and the judgment upon the verdict of the jury, they inevitably conflict. But give the authority its full weight, and we say it is utterly in conflict with the com-

appear. But without putting the case upon this ground, we think the defendants have shewn that ordinary and reasonable care was used to preserve the goods. The place in which the goods were deposited was as safe as that in which goods delivered by other steamers are usually put. There was no reason, at the time, for supposing they were in any danger from a flood.

There was nothing, so far as is disclosed by the testimony in this cause, to have deterred a very prudent man from allowing his goods to have been placed there. The inundation was unusual and entirely unexpected, and, when it came, reasonable and earnest efforts appear to have been made to protect them. The court is therefore of opinion that the owners of the steamer are not liable for the damage sustained in this case.

The chief witness to prove the degree of diligence used was the agent of the owners of the steamer, but he was called by the libellants, and there is nothing in the case to discredit his testimony. If, in another case, the evidence should be different upon the point of diligence, the decision of the court might of course be different. If, however, we are wrong in our opinion about the law of delivery, or as to the proper construction of the contract, and the goods, after having been landed, were still in the possession of the company as carriers, we should still think, upon another ground, that the owners of the steamer were not liable in this case. Carriers have never been held responsible for what is called the act of God, which, according to the interpretation of that phrase of law by Lord Mansfield in the case of Trent & M. Nav. Co. v. Wood, 26 E. C. L. 360, is natural necessity, (as winds and storms, which arise from natural causes,) and is distinct from inevitable accident. Inevitable accident may be the result of human agency, and is then, of course, not the act of God; but inevitable accident produced by irresistible physical causes is the same

thing with the act of God. "By inevitable accident," says Judge Story, "commonly called the act of God, is meant any accident produced by physical causes which are inevitable,—such as a loss by lightning, storms, perils of the seas, by inundations and earthquakes, or by sudden death or illness. Loss or damage caused by inundation is very commonly mentioned to illustrate the rule, and is as apt an illustration as any." In the case before the court it is alleged by the libellants, and shewn by the testimony, that the injury for which compensation is claimed was done by a freshet in James river. This was undoubtedly the direct and immediate cause of the mischief. But it is said in reply that the damage to the goods was occasioned by the flood and the culpable negligence of the carrier combined, and not by the flood alone. There may certainly be found a case or two like that of McArthur v. Sears, 21 Wend. 190, from which it may, perhaps, be inferred that the court was of opinion that carriers are responsible for loss produced by tempests, or inundations, or causes of like kind, when they have been guilty of the slightest imaginable degree of negligence, or have not used all possible precaution. We are of opinion, however, that wherever the question of diligence arises at all in the case of a carrier, he is bound, like other bailees for hire, warehousemen, or wharfingers, for example, to the exercise of due diligence; that is to say, of ordinary diligence only.

In most cases the carrier is also an insurer, and in such cases no degree of diligence or care or precaution can exonerate him, and therefore no question about degrees of diligence can ever arise. But whenever it can be shewn that the direct and immediate cause of damage is the act of God, the carrier, we think, is not responsible if he can show that he has used due and reasonable diligence; that is to say, in such a case, ordinary care, or such care as the generality of mankind use in their own concerns. He is surely not responsible because he may have failed to adopt some precaution which no man, not the most prudent and cautious of men, would ever have thought of; and if so, if there be any neglect or want of caution for which he is not responsible, so that the court is obliged to inquire into the degree or diligence he has exercised in a particular case, we know not what better rules can be applied than those which are applicable to other bailees for hire. Suppose, for instance, the owners of the steamer, instead of erecting their shed where they did, had built a warehouse on the north side of Main street, some feet higher than any freshet has risen within the memory of men, and goods there deposited had been injured by a rise in the river, can it be maintained that in such a case they would have been liable for the loss? Or suppose they had erected a warehouse entirely of wood, altogether beyond the

mon law rule as to the liability of carriers as shown in the decisions in England and this country from the time of Coggs v. Barnard, 1 Smith, Lead. Cas. (Lord Holt's opinion,) marg. p. 92, to the present day, both in England and this country. Gilbart v. Dale, 5 Adol. & E. 543; Griffiths v. Lee, 1 Car. & P. 110; 1 Term R. 659; Story, Cont. § 752b; Dusar v. Murgatroyd, [Case No. 4,199;] McArthur v. Sears, 21 Wend. 190; Hyde v. Trent & M. Nav. Co., 5 Term R. 389; Steamboat Co. v. Bason, Harp. 264; Colt v. McMecken, 6 Johns. 160; Siordet v. Hall, 15 E. C. L. 87; Boyle v. McLaughlin, 4 Har. & J. 291; Campbell v. Morse, Harp. 468; Sprowl v. Kellar, 4 Stew. & P. 382; Turney v. Wilson, 7 Yerg. 340; Friend v. Woods, 6 Grat. 189; 6 Whart. 505; Hill v. Humphreys, 5 Watts & S. 125. In all these authorities, and very numerous others we have at hand, the doctrine in Muddle v. Stride, if it can be supposed to be correctly reported, is overruled, and the common law liability of carriers for hire laid down to be that they are liable for all losses except such as happen from inevitable accident, without the intervention of man, or from the act of God, of the public enemy, or the owner of the goods.

reach of the water, and it had been destroyed, and the goods in it, by lightning, would they have been held liable because, if the house had been built of some less combustible material, of iron or of brick for example, it would not have been consumed, and the goods would have been safe? And, if the carrier would not have been liable in the cases put, it is shewn that there may be cases where they would not be liable, though they might not have taken the highest possible degree of care, or even that degree which some men of extreme caution might possibly have used. The reason of the strict rule of the common law with regard to carriers which was, as is stated by Lord Holt in the great leading case of Coggs v. Bernard, 2 Ld. Raym. 909, to prevent fraud and collusion which could not be proved, is wholly inapplicable to cases like those above supposed. Where once it is clearly proved that the loss or damage was the direct result of a storm or earthquake or inundation, there is an end to all possibility of collusion or of fraud in the matter; and if the carrier can then shew that he has exercised due diligence, we know not why he should not be exonerated as well as a warehouseman or other bailee for hire.

Amies v. Stevens, 1 Strange, 128, was a case in which the plaintiff put goods on board the defendant's hoy, who was a common carrier. Coming through a bridge the hoy sunk by a sudden gust of wind, and the goods were spoiled. The defendant was held not answerable, the damage being occasioned by the act of God. "For," it was said by the court, "though the defendant ought not to have ventured to shoot the bridge if the general bent of the weather had been tempestuous, yet this, being only a sudden gust of wind, had entirely differed the case." From which I infer that the court thought the carrier bound to exert ordinary prudence, and guard against all probable accidents, but not to provide against mere possibilities. The case of Colt v. McMecken, 6 Johns. 160, was just the reverse of Amies v. Stevens. In Colt v. McMecken, a vessel ran ashore in consequence of a sudden failure of the wind, and she afterwards sunk, in consequence of which the goods of the plaintiffs were lost or damaged by the water. The jury found a verdict for the defendants, and a new trial was moved for upon two grounds: 1st, for a misdirection to the jury in stating that the failure of the wind was the act of God; and 2d, for that the verdict was against evidence on the point submitted to the jury in relation to the negligence or carelessness of the master of the sloop after she struck. Spencer, Justice, delivering the opinion of the court, after remarking that the sudden cessation of the wind was the act of God, says, in reference to the second point: "The master did everything which could reasonably have been expected of him to prevent the vessel from sinking; accordingly my opinion is against a new trial." Kent, Chief Justice, differed from the other judges, but only as to the fact of negligence. He concurred in the general doctrine that the failure of the wind was the act of God, but thought the carrier had been negligent. "He ought," says the chief justice, "to have exercised more caution and guarded against such a probable event in that case as the want of wind to bring his vessel about."

In Siordet v. Hall, 15 E. C. L. 87, it was decided that where damage was done to a cargo by water escaping through the pipe of a steam boiler in consequence of the pipe having been cracked by frost, the carrier was responsible, upon the ground of negligence. Best, Chief Justice, said: "No one can doubt that this loss was occasioned by negligence. It is well known that frost will rend iron, and, if so, the master of a vessel cannot be justified in keeping water within his boiler in the middle of winter when frost may be expected. The jury found that this was negligence, and I agree with their verdict." With reference to the case of Dale v. Hall, 1 Wils. 281, in which it was held that a loss occasioned by a leak which was caused by rats gnawing a hole in the bottom of the vessel was not to be deemed a loss by inevitable casualty. Sir William Jones remarks that "the true reason of that decision was that it was at least ordinary negligence to let a rat do so much mischief in the vessel, and that the Roman law has so decided in an analogous case." Though Sir William may have been mistaken as to the reason which influenced the court in that case, the remark shews what his own opinion was as to the degree of negligence for which a carrier is in such cases responsible. The case of Bowman v. Teall, 23 Wend. 306, appears to me to sustain the same doctrine. Judge Story also says that the freezing of a canal is the act of God, and may be an excuse unless the carrier omits due diligence. The case of a canal freezing and the case of Siordet v. Hall, supra, seem to illustrate the mode and the exception. The freezing of a canal is an act of God, unavoidable by human diligence. The freezing of water in a boiler so as to cause it to crack might have been avoided. In the case of Boyle v. McLaughlin, 4 Har. & J. 291, cited at the bar, and in Campbell v. Morse, Harp. (S. C.,) both of which bore a considerable analogy to the case before the court, though the carrier was held liable in each case, it was on the ground of negligence.

It being clear that in the case before the court the inundation was the act of God, and it appearing to the court from the evidence in the cause that it was not foreseen when the goods were placed under the shed, and could not have been foreseen, but was most sudden, unusual, and unexpected; that there was no want of due care and caution in placing the goods there, or of due diligence in endeavoring afterwards to remove them, the court is of opinion that the damage was oc-

casioned by the act of God, and the defendants not liable for that reason.

NOTE, [from original report.] It is from this part of the opinion that we seriously dissent, and think we can show, upon authority conclusive at least in this country, and particularly so in Virginia, that the doctrine as laid down by the learned judge is not law. It appears, we think, from the very authorities he cites in his own support. In the case of Amies v. Stevens, [1 Strange, 128,] cited by the judge, it was decided that the act by which the loss was occasioned was an act of God, and that, therefore, the carrier was not liable; and we think the fair inference is, though it was considered the act of God, yet the carrier would have been held responsible if the slightest negligence had been shewn. So, in Colt v. McMechen, [6 Johns. 160,] cited as above, where the vessel ran ashore in consequence of a sudden failure of the wind, and the goods were injured, the court was of opinion that this was an act of God, and relieved the carrier of his liability; but even from this judgment Chancellor Kent dissented, being of opinion that the captain might have avoided the loss by tacking the ship before she was so near the shore as to run into it by the wind's sudden failure. So, in Siordet v. Hall, also cited by Judge H., where damage was done to a cargo by water escaping through the pipe of a steam boiler, in consequence of the pipe having been cracked by frost, the carrier was held responsible, though the freezing was the act of God, yet the consequences might have been avoided by care. In the case of Dale v. Hall, [1 Wils. 281,] also, it was held that a loss occasioned by a leak which was caused by rats gnawing a hole in the bottom of a vessel was not to be deemed a loss by inevitable casualty. These are the only authorities which Judge Haliburton cites, and in our opinion, so far from supporting him, they are very strong the other way.

The rule, so far as we have been able to gather it from a careful examination of the authorities, seems to be that the inevitable accident (or the act of God, for in many of the authorities these are used as convertable terms) which will excuse a carrier from his liability as such must be such an accident as could not have been avoided by the exercise of any human skill and foresight. For this proposition we have authority in almost every state in the Union where such a question would be likely to arise. For instance, in the case of McArthur v. Sears, 21 Wend. 190, cited with disapprobation by Judge H., it is explicitly decided by the supreme court of New York that nothing will excuse a carrier from liability except inevitable accident or acts of public enemies, and proof of the utmost care was inadmissible. In that case the captain stranded the vessel by mistaking a light, and it was shown that it was almost impossible to avoid the mistake which caused the accident. We have already noticed the opinion of that distinguished jurist, Chancellor Kent, in the case of Colt v. McMechen, decided by the same court. In Boyle v. McLaughlin, 4 Har. & J. 291. An unexpected freshet in the river injured flour which the carrier had placed in a situation generally safe on the bank. It was held he was liable because he might have placed the flour in a situation where no such liability would have existed. So in Steamboat Co. v. Bason, Harp. 262, the supreme court of South Carolina decided, in a case where a steamboat was grounded, where grounding was inevitable, and the stern of the vessel sank, and bilge water injured the goods that, although great care was taken, possibly greater diligence might have been used. The same court, in the case of Campbell v. Morse, referred to above, decided that in a case where a waggoner, crossing a regular ford, was stalled, and, the creek rising rapidly, the goods were injured, the car-

rier was held responsible because he might have avoided the accident.

In the case of Sprowl v. Kellar, 4 Stew. & P. 382, it is said in the judgment of the court that the inevitable accident which excuses a carrier must be beyond the prevention and control of human prudence. So, in the case of Turney v. Wilson, 7 Yerg. 340, it is decided that a carrier is liable for all losses that could have been prevented by any human skill and foresight. In the case of Eagle v. White, 6 Whart. 505, the defendants, who were common carriers on the railroad from Philadelphia to Columbia, undertook to carry certain boxes of goods belonging to the plaintiffs from Philadelphia to Columbia. The cars arrived at the latter place about sun-down on a Saturday evening, and by direction of the plaintiff were put on a sideling. The plaintiffs declined receiving the goods on that evening, on the ground that it was too late, whereupon the agent of the defendant left the cars on the sideling, taking with him the keys of the cars, and promised to return on Monday morning. The car remained in this situation until Monday morning, when they were opened by the plaintiff by means of a key which fitted the lock; and on examination it was discovered that one of the boxes had been opened, and the contents taken away. Held, that the defendants were liable to the plaintiff for the value of the goods lost. The defendants were held liable as common carriers. Rogers, J., delivering the opinion of the court, said: "A common carrier is in the nature of an insurer, and is answerable for accidents and thefts, and even for a loss by robbery. He is liable for all losses which do not fall within the excepted cases of the act of God or inevitable accident, without the intervention of man and public enemies. This, as Chancellor Kent remarks in his Commentaries, has been settled law for ages; and the rule is intended as a guard against fraud and collusion, and is founded on the broad principles of public policy and convenience. It is a principle of extraordinary responsibility, which has stood the test of experience, and which we are unwilling to see frittered away further than has been already done in those cases where carriers have been, as I think, unwisely permitted to limit their own responsibility." In Dusar v. Murgatroyd, [Case No. 4,199,] Judge Washington decided that the owner of a vessel was answerable for the carelessness or unskilfullness of his master, and that by the common law nothing could excuse a carrier but the act of God, of the public enemy, or of the party complaining.

In Virginia, in as full and explicit a manner as in any other state in the Union, the common law doctrine of the liability of carriers is decided in our courts in Murphy v. Staton, 3 Munf. 239. There, the court of appeals decided that "a common carrier is liable for all accidents to goods entrusted to him for transportation except such as arise from the act of God, the public enemy, or owner of the goods," and that, in order to excuse a carrier from his liability as such, "it is not enough for him to prove (the goods being carried by water) that the navigation is attended with so much danger, that a loss may happen, notwithstanding the utmost endeavors of the waterman and crew to prevent it, that the person conducting the boat possesses competent skill, has used due diligence, and provided hands of sufficient strength and experience to assist him." The onus lies on him to exempt himself from liability. So, in the case of Friend v. Woods, 6 Grat. 189, the court of appeals sanctions the doctrine laid down in Murphy v. Staton, that the common law liability of carriers is the law of Virginia, and Judge Daniel, delivering the unanimous opinion of the court, says: "By the common law a carrier is treated as an insurer against all damage to or loss of goods intrusted to him for transportation, except such as may arise from the act of God, the public enemies,

or the act of the owner of the goods;" and, further: "The case (Murphy v. Staton) may be regarded as settling that the liabilities of common carriers upon our navigable streams are fixed by the common law rule, and that losses arising from the ordinary dangers of navigation, however great and however carefully guarded against, do not fall within the exception." This case came up on an exception to the instruction of the court below "that if the jury believed from the evidence that the boat was stranded by running upon a bar previously formed in the ordinary channel of the river, but that the existence of the bar might by human foresight and diligence have been ascertained and avoided, although those in charge were ignorant of its existence at the time the boat ran upon it, the defendants were liable for the loss." This instruction the court of appeals unanimously affirmed, and in the opinion cites with approbation the decision in McArthur v. Sears, the case to which Judge H. also refers, and which he overrules. We think these cases show that, so far from there having been any modification of the common law doctrine of the liability of carriers, that liability, in most of the states of the Union, has been upheld in its broadest extent, and that the rule laid down in the decision of Friend v. Woods and McArthur v. Sears, that a carrier is answerable for injury to goods in his charge, wherever that injury might have been ascertained and avoided by human foresight and diligence, or by the use of all possible precaution, is the rule of law upon the subject in this country. We have been the more particular in our consideration of these authorities because we think that the adoption of the modified rules laid down in this opinion would generally place the mercantile community in the power of insolvent and irresponsible agents, and enable them, by fraud or negligence, to inflict incalculable mischief.